2023 IL App (1st) 220273

SIXTH DIVISION
June 9, 2023

No. 1-22-0273

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| BRIAN J. WANCA, J.D., P.C., d/b/a ANDERSON + WANCA ATTORNEYS AT LAW, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant/Cross-Appellee, | ) ) | No. 2017 CH 08373 |
| v. | ) ) ) | The Honorable Margaret Ann Brennan and the Honorable Mary |
| DAVID M. OPPENHEIM, | ) ) | Colleen Roberts, |
| Defendant-Appellee/Cross-Appellant. | ) | Judges, presiding. |

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     Anderson + Wanca Attorneys at Law (A+W) appeals the trial court's denial of its trade secrets, spoliation of evidence, and breach of fiduciary duty claims. Oppenheim cross-appeals the denial of his abuse of process counterclaim. We affirm the judgment of the circuit court in part and reverse in part. We find that the circuit court correctly concluded that A+W's trade secrets and spoliation of evidence counts failed and properly dismissed Oppenheim's abuse of process claim. However, we find that it improperly granted summary judgment to Oppenheim on the breach of fiduciary duty claim, so we reverse and remand for a trial on this count.

¶ 2                                    I. BACKGROUND

¶ 3     A+W is a law firm specializing in class action litigation. In 2009, A+W principal Brian

Wanca hired David Oppenheim as an associate attorney. Oppenheim worked on a variety of

cases at A+W over the years but focused primarily on class action lawsuits under the Telephone

Consumer Protection Act of 1991 (TCPA) (47 U.S.C. § 227 (2012)). While Oppenheim was

employed at A+W, the firm frequently co-counseled with the Bock Law Firm (BLF) on class

action lawsuits.

¶ 4     On April 3, 2016, Oppenheim accepted a position with BLF. He received a $100,000

signing bonus from BLF, and an additional several hundred dollars from BLF's principal, Phillip

Bock, to purchase a computer. On April 5, 2016, Oppenheim took his A+W laptop to Abt, an

electronics store, and purchased a new personal laptop with funds he had received from Bock.

Oppenheim directed Abt to copy the entire contents of his A+W laptop hard drive, as well as a

year's worth of his A+W e-mails, onto his new laptop computer.

¶ 5     On April 7, 2016, Oppenheim informed A+W he was resigning because he had accepted

a position with BLF. He asked A+W attorney Ross Good to forward him certain e-mails after his

departure, which Good agreed to do. After Oppenheim told Wanca he was leaving, Wanca asked

Oppenheim if he was taking any A+W property with him; Oppenheim confirmed he was not.

Wanca then instructed Oppenheim to leave his laptop, key, and keycard. Wanca asked Good to

deactivate Oppenheim's e-mail account and his remote access to all A+W computer drives.

Oppenheim never informed anyone at A+W that he had copied A+W materials to his newly

purchased personal computer prior to his departure.

¶ 6     On April 11, 2016, his first day at BLF, Oppenheim copied the contents of his personal

laptop, including all materials he had downloaded from his A+W laptop computer, onto his BLF

computers. The file containing his A+W e-mails was too large to transfer, so Oppenheim forwarded select e-mails from his A+W account to his BLF e-mail account.

¶ 7    On May 7, 2016, BLF filed a class action lawsuit against the Tampa Bay Buccaneers professional football team (Buccaneers). Oppenheim was screened from participating in this matter because A+W had already filed a class action lawsuit against the Buccaneers in June 2013 and Oppenheim had assisted with negotiations in that case. Medical & Chiropractic Clinic, Inc. (M&C), was one of the class representatives in the suit A+W filed against the Buccaneers. Shortly after BLF filed suit against the Buccaneers, M&C filed a lawsuit against Oppenheim, alleging Oppenheim had breached his fiduciary duty to them. A+W agreed to pay M&C's legal fees for this action.

¶ 8    It was not until March 2017 that A+W learned that Oppenheim had taken A+W electronic files with him when he left the firm. A+W then exchanged a number of letters with Oppenheim over the course of several months in an attempt to recover the materials he had taken, but the parties could not reach an agreement.

¶ 9    On June 15, 2017, A+W filed suit against Oppenheim, alleging (1) violation of the Illinois Trade Secrets Act (Act) (765 ILCS 1065/1 *et seq.* (West 2016)); (2) conversion; and (3) breach of fiduciary duty. After A+W was informed by Oppenheim that his personal computer had been stolen out of his unlocked car, A+W amended its complaint and added a spoliation of evidence claim. A+W's lawsuit centered on a number of electronic documents that Oppenheim had taken from A+W prior to his departure, including several lists of A+W clients, a case settlement chart, and a case status chart Oppenheim had created when he worked at A+W. A+W claimed that these documents were "trade secrets."

¶ 10     The client lists were pulled by A+W attorney Good from A+W's master client database and e-mailed to Oppenheim. A+W's master client database contained information about more than 1300 A+W clients. Some were current A+W clients, and others were potential clients who had expressed interest in working with A+W on class action cases.

¶ 11     Good testified in his deposition and at trial that he used the client database to identify class representative plaintiffs for TCPA cases and to identify backup plaintiffs when necessary, and that access to the client database was restricted to very few A+W employees. Oppenheim did not have access to the client database himself, so he received potential client lists only when Good e-mailed them to him. These client lists did not include any sort of disclaimers or warnings that they contained sensitive information or should not be shared, and Good never told Oppenheim not to share these lists with others. No evidence indicated that Oppenheim ever disclosed these client lists to anyone after his departure from A+W, attempted to contact any of the clients on these lists, or was retained by any of these clients after his departure from A+W.

¶ 12     The case settlement chart created by Oppenheim contained data for 51 A+W TCPA class action lawsuit settlements approved by courts between 2011 and 2016. BLF had access to the same information contained in the chart for 42 of these cases because it had jointly litigated them with A+W. The charts included the following information for each case: (a) the named parties, (b) the case number, (c) the court that approved the settlement, (d) the date the settlement was approved, (e) the settlement fund amount, (f) the amount of attorney fees awarded, (g) the amount paid per fax, (h) the average recovery per class member, (i) the number of class members, (j) the number of valid claims submitted, (k) the total amount paid to claimants, (l) the claim rate, which is calculated by dividing the number of class members submitting claims by the number of class members, (m) certain ratios, such as the ratio of the amount of attorney fees

awarded to the settlement fund, (n) the source of the settlement fund (*e.g.*, the defendant or an insurance carrier), and (o) whether a declaratory judgment action was filed regarding insurance coverage.

¶ 13    Much of the information contained in this chart was publicly available. However, to obtain some of the information—such as the settlement fund and attorney fees—an individual would need to search dockets in jurisdictions across the country. Oppenheim estimated that the settlement chart took him about four hours to create; Good spent several hours working on the chart as well. The case settlement chart was stored only on Oppenheim's A+W laptop. Oppenheim frequently relied on the settlement chart when writing briefs or preparing for mediations, both at A+W and BLF. Good testified that Oppenheim was instructed to share the chart only with him and Wanca, and Wanca testified that he instructed Oppenheim not to share the chart with BLF attorney Phillip Bock. Oppenheim, by contrast, testified at trial that he only recalled being told by Wanca not to share the settlement chart with another A+W attorney because Wanca did not want that attorney to know how much money the firm was making. Oppenheim admitted that he e-mailed the settlement chart to BLF attorney Phillip Bock, who used the chart in connection with a settlement he negotiated. A+W never attempted to determine whether the settlement chart would have any value in the marketplace, but Good estimated that it would cost approximately $48,200 for someone with no connection to the cases in the settlement chart to recreate it. No additional testimony about the chart's value was offered.

¶ 14    The case status chart Oppenheim created detailed the status of various A+W TCPA cases. For 27 TCPA cases where a settlement had been reached, the chart identified the amount of attorney fees awarded, the percentage of those fees A+W would receive, the amount of expenses A+W had incurred, the total amount A+W would receive in fees and expenses, whether the

settlement had been approved, whether A+W had received payment, whether payment would be deferred, and any notes related to the settlement status. For 14 cases where settlement was being negotiated in 2015 and 2016, the chart identified the status of those negotiations. For seven cases where judgments had been entered, the case status chart included the amount of attorney fees awarded, the percentage of those fees A+W would receive, and an explanation of how the judgment was entered (such as whether the case was won on summary judgment).

¶ 15    On September 11, 2017, Oppenheim filed a motion to dismiss all counts, and on June 20 2018, the court dismissed the conversion count. A+W then moved to transfer the case to the Law Division because injunctive relief was no longer at issue; the motion was granted on April 19, 2018.

¶ 16    On July 20, 2018, Oppenheim filed a counterclaim against A+W, alleging an abuse of process and claiming that A+W was financing M&C's lawsuit against him. The trial court dismissed Oppenheim's counterclaim on October 30, 2018, stating,

> "There is no abuse of process when the process is used to accomplish the result for which it was created, regardless of an incidental motive or ulterior purpose *** The Court finds that Oppenheim's counterclaim for abuse of process fails to allege that Wanca made an illegal, improper, or perverted use of process *** [T]he suit by M&C was a proper use of process, as it was a legitimate lawsuit alleging Oppenheim breached his fiduciary duty to M&C. Further, there was no ulterior motive present because M&C's explicit relief sought was to prevent Oppenheim from representing a competing class."

¶ 17    Oppenheim then moved for summary judgment on the breach of fiduciary duty, violation of the Act, and spoliation of evidence claims. Judge Brennan granted Oppenheim's motion for summary judgment on the breach of fiduciary duty claim on the basis that it was preempted by

the Act, stating, "everything that [A+W is] claiming in the breach of fiduciary duty is that there was a misappropriation of items from the firm which falls into the trade secret."

¶ 18    A bench trial before Judge Brennan on the remaining two counts was held on July 20 and 21, 2021. A+W attorneys Good and Wanca testified for the plaintiff, as well as forensic expert witness Nathaniel Schnader. Oppenheim was called as an adverse witness.

¶ 19    On August 27, 2021, the court entered a written order with its findings. Although it had previously granted Oppenheim's motion for summary judgment on the breach of fiduciary count, it again addressed the claim. It found that Oppenheim had breached his fiduciary duty to A+W but concluded that A+W had failed to demonstrate it had suffered damages. The court noted that A+W had not "proven any loss of clients or fees from such clients" or that "BLF absconded with any of [A+W's] clients as a result of the retention of [A+W's] Confidential Information."

¶ 20    The court also readdressed the previously dismissed conversion claim and found that A+W failed to prove the elements of conversion because "the copying of digital material does not constitute tangible property," A+W had not been deprived of any documents, and all of the documents that Oppenheim copied were still accessible to A+W.

¶ 21    On the violation of the Act count, the court found that A+W had established the existence of a protected trade secret in both its clients lists and the settlement charts created by Oppenheim. It found that the compilation of information contained in the settlement charts "would not be easily duplicated without expending significant time and effort." It also found that A+W took sufficient steps to safeguard the information contained in the client lists and settlement charts because Wanca told Oppenheim not to disclose the settlement charts to others and because Oppenheim was unable to access the information in A+W's client database without it being sent directly to him. However, the court found that A+W failed to prove

misappropriation because it "produced no evidence in support of its argument that Confidential Information was procured for and used by BLF." It also found that A+W failed to prove it had suffered any damages as a result of Oppenheim's actions.

¶ 22    On the spoliation of evidence claim, the court said it was "unable to find that [A+W] was damaged from [Oppenheim's] loss of the Confidential Information without engaging in speculation," so it found in favor of Oppenheim on that count as well.

¶ 23    A+W moved to vacate the judgment, but Judge Roberts, to whom the matter had been reassigned after Judge Brennan retired, declined to change Judge Brennan's prior order, finding that A+W "failed to adequately establish any harm or actual damages as a result of Defendant's alleged misappropriation." The court also found that A+W "had not proven misappropriation of Confidential Information and that to find such based on the evidence produced by Plaintiff at trial would require the court to engage in speculation." The court also declined to reconsider its decision not to award a reasonable royalty or punitive damages.

¶ 24    A+W timely appealed the trial court's denial of its Act, breach of fiduciary duty, and spoliation of evidence claims, and Oppenheim cross-appealed the trial court's dismissal of his abuse of process counter claim.

¶ 25                                   II. ANALYSIS

¶ 26    Before turning to the merits of parties' claims, we address Oppenheim's request that we strike the statement of facts in A+W's reply brief because it contains impermissible argument. We decline to strike a party's statement of facts "unless it includes such flagrant improprieties that it hinders our review of the issues." *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009). We do not find it necessary to strike A+W's statement of facts here. Instead, we will merely disregard any improper or unsupported statements. *Id.*

¶ 27    "[T]he standard of review in a bench trial is whether the order or judgment is against the manifest weight of the evidence." *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. A decision is against the manifest weight of the evidence "only if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence." *International Capital Corp. v. Moyer*, 347 Ill. App. 3d 116, 122 (2004).

¶ 28                                A. Trade Secrets Claim

¶ 29    The trial court determined that A+W had established the existence of protectable trade secrets in the client lists and the settlement and case status charts created by Oppenheim. It noted that "while the individual components of the settlement chart may have been known to parties other than [A+W] and [A+W's] necessary confidants, the compilation of such information is not without value and would not be easily duplicated without expending significant time and effort." The trial court also noted that Oppenheim was told not to disclose the settlement charts to others, was unable to access the client database without authorization, and did not have access to the client lists without them being e-mailed to him. However, the court found that A+W failed to provide sufficient evidence that Oppenheim misappropriated the confidential information or that A+W had proven the requisite damages, so it ruled in Oppenheim's favor on the violation of the Act count.

¶ 30    On appeal, A+W argues that the trial court properly found the existence of protectable A+W trade secrets in its client lists and settlement and status charts but erred when it failed to find that Oppenheim "misappropriated" trade secrets when he left A+W or to consider all categories of damages A+W is entitled to in light of this misappropriation. Oppenheim argues that the court reached the correct result but erred when it found that the materials A+W presented at trial rose to the level of trade secrets because the settlement charts were little more than

summaries of largely publicly available information related to class actions cases, much of the settlement information came from cases that A+W and BLF co-counseled on and therefore was known by BLF already, and A+W did not take sufficient measures to protect the documents at issue.

¶ 31　We conclude that the trial court's finding—that the documents at issue constitute protected trade secrets—was against the manifest weight of the evidence so we affirm the trial court's decision on alternate grounds. See *Babiarz v. Stearns*, 2016 IL App (1st) 150988, ¶ 38 (a reviewing court "may affirm the trial court's judgment on any basis that is supported by the record, regardless of whether the trial court relied on that basis.")

¶ 32　To establish a violation of the Act, a plaintiff must show that "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 281 (2005). The Act defines a "trade secret" as

> "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).

¶ 33　To determine whether a trade secret exists, the court considers (1) the extent to which the information is known outside the plaintiff's business, (2) the extent to which it is known by

employees and others involved in the plaintiff's business, (3) the extent of measures taken to guard the secrecy of the information, (4) the value of the information to the plaintiff and to the plaintiff's competitors, (5) the amount of effort or money expended by the plaintiff in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 740 (2009). "Of these factors, the most important is whether and how an employer acts to keep the information secret." *Id.* If an employer has invested "substantial time, money, and effort to obtain a secret advantage," that weighs in favor of finding the existence of a trade secret. *Id.* By contrast, "[w]here information can be readily duplicated without involving considerable time, effort or expense, it is not a trade secret." *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 331 Ill. App. 3d 777, 791 (2002).

¶ 34    A+W alleges that the lists of potential A+W clients attorney Good e-mailed to Oppenheim on a number of occasions constitute trade secrets because they came from A+W's client intake database, which contains information about more than 1300 A+W clients, and very few A+W employees have access to the database, which requires two-factor authentication to access. But even assuming the client database as a whole contains information "sufficiently secret to give [A+W] a competitive advantage" (*Liebert*, 357 Ill. App. 3d at 276), the entire database is not at issue here. Instead, A+W's trade secrets claim turns on three potential client lists that Good pulled from A+W's client database and e-mailed to Oppenheim. These lists contained contact information for a total of 20 potential clients. It is undisputed that none of the client lists Good e-mailed to Oppenheim contained any disclaimers or warnings that they contained confidential information or that they should not be shared, and Good conceded he never instructed Oppenheim not to share these lists with others. In fact, Good admitted he would

have had no issue with Oppenheim sharing one of the lists of potential clients with BLF for work on a joint case, and evidence established that A+W routinely provided similar potential client lists to BLF on joint cases. Taken together, the evidence does not support a finding that A+W took adequate measures to protect the information contained in the client lists that were e-mailed to Oppenheim or to maintain their confidentiality. Therefore, we find that the client lists at issue here do not qualify as trade secrets. See *Gillis Associated Industries, Inc. v. Cari-All, Inc.*, 206 Ill. App. 3d 184, 191-92 (1990) (finding customer lists were not protected trade secrets because the plaintiff did not take reasonable measures to protect them; the lists were not marked confidential, employees were not instructed on the lists' confidentiality, and no evidence was produced to show that employees understood the lists to be confidential); *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 574 (1992) ("customer lists *** will be deemed a protectable trade secret only where the information has been developed by the employer over a number of years at great expense and kept under tight security"); but see *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 589 (1995) (finding customer lists to be protected trade secrets because customer information was limited to people on a need-to-know basis, the lists were locked up, the lists could not be removed from the office, employees were required to sign confidentiality agreements that stated the names of plaintiff's customers could not be used or disclosed because they were confidential, and employees were constantly reminded about the customer lists' confidentiality).

¶ 35    A+W next argues that the trial court correctly found that the case settlement chart Oppenheim created qualifies as a trade secret because it was a compilation, not all of the information contained in the chart was publicly available, and it would have taken significant time and effort to recreate the chart. But again, the evidence does not support a finding that the

information contained in the settlement chart was "sufficiently secret to give them a competitive advantage" or that it would have taken significant time and effort to recreate. *Liebert*, 357 Ill. App. 3d at 276. First, 42 of the 51 cases on the case settlement chart were jointly litigated with BLF, so BLF had access to most of the same information contained in the chart. In addition, both parties acknowledged that much of the information contained in the chart was not secret at all because it had been filed publicly in courts across the country. Moreover, A+W took no heightened measures to guard the secrecy of the information contained in the settlement chart—it was not stored in a secure database on A+W's server, the document itself contained no indicia of confidentiality, and Good admitted that A+W had disclosed a very similar case settlement chart to opposing counsel in a separate TCPA case. See *System Development Services, Inc. v. Haarmann*, 389 Ill. App. 3d 561, 579 (2009) (a plaintiff cannot "bestow trade secret status to information that is already commonly known in the industry [or] is readily ascertainable"). What is more, testimony at trial established that the settlement chart had taken less than 10 hours to create. Oppenheim estimated that it had taken him about four hours to create the chart, and Good testified that he spent a few hours working on it. See *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1094 (2007) (facts weighed against a finding that a spreadsheet could constitute a trade secret because the sheet could be reproduced in two to three days and the bulk of the information was "primarily public"). Taken together, the evidence presented undercuts A+W's claim that the case settlement chart was a protectable trade secret.

¶ 36    For the same reasons, the case status chart Oppenheim created does not qualify as a trade secret either. Oppenheim testified that it took him only a few hours to create, the chart was saved on his desktop computer, and it was not kept under tight security. Therefore, the trial court's

finding—that the client lists, case status chart, and case settlement chart were protected trade secrets—was against the manifest weight of the evidence.

¶ 37 Because we conclude that the evidence does not support a finding that A+W's materials were protectable trade secrets, the issues of misappropriation or damages are moot. We therefore affirm the trial court's decision—albeit on different grounds—on the violation of the Act count.

¶ 38 B. Breach of Fiduciary Duty Claim

¶ 39 When ruling on Oppenheim's motion for summary judgment on the breach of fiduciary duty claim, the trial court stated, "Everything that [A+W is] claiming in the breach of fiduciary duty is that there was a misappropriation of items from the firm which falls into the trade secret, so the breach of fiduciary duty is out. Summary judgment is actually granted in favor of [Oppenheim]."

¶ 40 No evidence expressly related to the breach of fiduciary duty claim was presented at trial because that claim had been disposed of on summary judgment in favor of Oppenheim based on the court's conclusion that the claim was preempted by the Act. Nevertheless, Judge Brennan addressed the claim in her August 27, 2021, order, following the bench trial, and found that Oppenheim, as an attorney "should have been aware of the duty of loyalty owed to his employer" and that he breached this duty by "copy[ing] numerous files" onto his new laptop. Nevertheless, the court found that the claim failed because A+W "failed to prove that BLF absconded with any of its clients" or to prove any other damages.

¶ 41 On appeal, A+W argues that the Court "misapplied" breach of fiduciary duty law when it failed to consider all categories of damages available, including compensatory and punitive damages. Oppenheim conversely argues that the court properly granted summary judgment to him on the breach of fiduciary duty claim because it is preempted by the Act. Oppenheim

alternatively argues that the trial court correctly denied the claim based on A+W's failure to prove damages.

¶ 42    We note that although the trial court readdressed the breach of fiduciary duty claim in its written order after trial, it did so in error because it had already disposed of the claim at the summary judgment phase and that claim was not tried. Therefore, we review the trial court's decision on Oppenheim's motion for summary judgment *de novo*. *Jackson v. Graham*, 323 Ill. App. 3d 766, 773-74 (2001). Summary judgment is proper when the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2014). To determine whether a genuine issue of material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits "strictly against the movant and liberally in favor of the opponent." *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986).

¶ 43    In his motion for summary judgment, Oppenheim argued that because A+W's breach of fiduciary duty claim "rest[ed] on alleged misappropriation of A+W secrets," it was preempted by the Act. We find, however, that A+W's breach of fiduciary duty claim presents a genuine issue of material fact. A+W based its breach of fiduciary duty claim on its allegation that Oppenheim accepted compensation from BLF while still employed at A+W and took thousands of confidential documents with him prior to his departure from A+W, including a year's worth of e-mails and many other documents that A+W did not claim to be protected "trade secrets." Because Oppenheim's actions that A+W challenged related to matters that were not "trade secrets," we find that A+W's breach of fiduciary duty claim was not preempted by the Act. See, *e.g.*, *Alpha School Bus*, 391 Ill. App. 3d at 737 (finding that the Act did not preempt plaintiff's breach of fiduciary duty claim because defendant had established a competing business while

15

still employed at Alpha, solicited Alpha's employees to work for the competing business, and converted various property of Alpha); see *also Abanco International, Inc., v. Guestlogix, Inc.*, 486 F. Supp. 2d 779, 781-82 (N.D. Ill. 2007) (common law claims were not displaced by the Act because "the complaint does not restrict its claims to the misappropriation of trade secrets, but may potentially include other 'information ***' as well").

¶ 44    However, because the trial court improperly disposed of the breach of fiduciary duty claim at the summary judgment phase, A+W was never given the opportunity to present evidence in support of this claim at trial. For this reason, we reverse and remand for a trial on the merits of A+W's breach of fiduciary duty claim.

¶ 45                    C. Spoliation of Evidence Claim

¶ 46    Oppenheim testified that, on June 13, 2017, his personal laptop computer was stolen out of his car. The next day, he filed a police report about the incident, in which he noted that he had left his car unlocked. A+W's spoliation of evidence claim alleged that Oppenheim negligently allowed evidence to be lost when he left his personal laptop in his unlocked car. At trial, the trial court noted that it "g[ave] significant weight to [A+W] in favor of spoliation of the evidence," but concluded that A+W failed to prove that it had been damaged by Oppenheim's loss of the information contained on his personal laptop and so found in Oppenheim's favor on this count. A+W filed a motion to vacate the judgment, but the court denied the motion, stating, "[a]lthough [A+W] suggests that if it were able to examine the laptop, it would have found evidence of spoliation, this is not supported by the evidence the Court was able to examine at trial."

¶ 47    A+W argues on appeal that the court erred by imposing "too high a standard for A+W to prevail" on its spoliation claim. Oppenheim conversely argues that the court misapplied Illinois law when it found that Oppenheim owed a duty to A+W to preserve the laptop at all. However,

16

he argues that the trial court reached the correct result because A+W pointed to no evidence that Oppenheim's laptop would have contained any information relevant to the Act claim beyond the information A+W had already discovered through its forensic inspection of the computers Oppenheim used at A+W and BLF. Moreover, Oppenheim argues that A+W's inability to establish any damages is fatal to the spoliation claim.

¶ 48    "Under Illinois law, spoliation of evidence is a form of negligence; proof of spoliation requires a showing that the defendant owed the plaintiff a duty to preserve  evidence, breached that duty, and thereby proximately caused the plaintiff to be unable to prove the underlying cause of action." *Brobbey v. Enterprise Leasing Co. of Chicago*, 404 Ill. App. 3d 420, 433 (2010). A plaintiff must allege that "a reasonable person in the defendant's position should have known the evidence would be material to potential civil litigation." *Jones v. O'Brien Tire & Battery Service Center, Inc.*, 374 Ill. App. 3d 918, 924-25 (2007). The plaintiff must also prove that "but for the destruction of these records, she would have had a reasonable probability of succeeding in her case." *Holloway v. Sprinkmann Sons Corp. of Illinois*, 2014 IL App (4th) 131118, ¶ 146. "[I]f the plaintiff could not prevail in the underlying action even with the lost or destroyed evidence, then the defendant's conduct is not the cause of the loss of the lawsuit." *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 196 n.2 (1995).

¶ 49    A+W argues that if it had access to Oppenheim's personal laptop, it could have "verif[ied] specific materials" taken by Oppenheim and that "without the stolen laptop, the Court and A+W are left to take Oppenheim's word as to the extent of A+W materials he pilfered." However, A+W's forensic expert, Nathaniel Schnader, was able to examine Oppenheim's A+W laptop to determine exactly what A+W documents and e-mails Oppenheim had taken. Schnader was also able to examine Oppenheim's two BLF computers to determine which A+W documents

Oppenheim had uploaded and accessed there. Although A+W argues that they could have "explor[ed] other locations where Oppenheim sent A+W materials" and "search[ed] for evidence of [Oppenheim's personal] laptop connecting to the A+W network indicating potential other locations where Oppenheim pulled A+W data," A+W cannot explain how or why this could have provided them with any additional information to help prove up their trade secrets or breach of fiduciary duty claims. We therefore affirm the trial court's finding in favor of Oppenheim on A+W's spoliation count.

¶ 50                                  D. Abuse of Process Counterclaim

¶ 51    In June 2013, when Oppenheim was still working for A+W, the firm filed a class action lawsuit against the Buccaneers in Florida. M&C was added as a named plaintiff in January 2014. On May 7, 2016, several weeks after Oppenheim left A+W and went to work for BLF, BLF filed a separate class action against the Buccaneers with two new class representatives. M&C then filed suit against Oppenheim and BLF, alleging that Oppenheim breached his fiduciary duties to M&C and that BLF aided and abetted Oppenheim in his breach. A+W agreed to pay M&C's legal fees for this action.

¶ 52    Because of this lawsuit, Oppenheim filed an abuse of process counterclaim against A+W, alleging that A+W abused process by causing the M&C lawsuit to be filed against him. The court granted A+W's motion to dismiss, concluding that Oppenheim's complaint failed to allege an improper, illegal or perverted use of process by A+W. The court noted that A+W was not party to the lawsuit between M&C and Oppenheim and that the suit by M&C "was a legitimate use of process, as it was a legitimate lawsuit alleging Oppenheim breached his fiduciary duty to M&C." The court also concluded "there was no ulterior motive present because M&C's explicit relief sought was to prevent Oppenheim from representing a competing class." The fact that

A+W may have decided to pay M&C's legal fees to prevent Oppenheim from representing a competing class did not negate M&C's motive of filing the lawsuit to seek relief for Oppenheim's breach of fiduciary duty.

¶ 53    Oppenheim argues that the trial court erred when it dismissed his abuse of process counterclaim because A+W caused the M&C action to be brought against him and did so with an improper purpose. A+W argues that Oppenheim waived his right to appeal this issue because he never amended his counterclaim. A+W also argues that the trial court properly dismissed Oppenheim's counterclaim here because A+W was not a party to the M&C action and the action was brought for a legitimate purpose.

¶ 54    In reviewing a trial court's ruling on a section 2-615 motion to dismiss (see 735 ILCS 5/2-615 (West 2014)), this court applies a *de novo* standard of review. *Heastie v. Roberts*, 226 Ill. 2d 515, 530-31 (2007). We "accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts." *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶ 5. "The critical inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted." *Id.*

¶ 55    As a threshold matter, we reject A+W's argument that Oppenheim forfeited his right to appeal the trial court's dismissal of his abuse of process counterclaim because he failed to replead it. "The rules governing the preservation of dismissed claims for purposes of appellate review are clear and well settled." *Bonhomme v. St. James*, 2012 IL 112393, ¶ 17. One way a party can avoid waiver and preserve a dismissed claim is by standing on the dismissed count and arguing the matter at the appellate level. *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 719 (2010). That is exactly what Oppenheim did here. A+W nevertheless

argues that because the trial court's dismissal order was silent as to prejudice, it "certainly did not dismiss the Counterclaim *with* prejudice," and therefore Oppenheim's failure to re-plead his claim constitutes a waiver of his right to appeal. (Emphasis in original.) "Generally, a dismissal of a complaint is not a final and appealable order unless the court states that the dismissal is 'with prejudice.' " *McMann v. Pucinski*, 218 Ill. App. 3d 101, 106 (1991). However, when the court is silent as to prejudice, "it is necessary to look to the substance of what was actually decided by the dismissal order to determine if the order is a final and appealable one." *Id.* If dismissal could be remedied by a "technical amendment," the order is not appealable. *Village of Orion v. Hardi*, 2022 IL App (4th) 220186, ¶ 20. If, however, "the dismissal was due to a substantive legal deficiency, the dismissal order is final." *Id.* In its dismissal order, the trial court found that Oppenheim "fail[ed] to allege [A+W] made an illegal, improper, or perverted use of process" because "the suit by M&C was a proper use of process, as it was a legitimate lawsuit alleging Oppenheim breached his fiduciary duty to M&C." Because the trial court dismissed Oppenheim's abuse of process claim based on a substantive legal deficiency, its order was final, and Oppenheim properly appealed the court's dismissal of his counterclaim. We now turn to the merits of his claim.

¶ 56    We note that while the trial court determined that Florida law should apply to the abuse of process claim, the parties agree that the court should have applied Illinois law because " '[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome.' " *Landmark American Insurance Co. v. NIP Group, Inc.*, 2011 IL App (1st) 101155, ¶ 21 (*quoting Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155 (2007)).

" 'If the relevant laws of the two states yield essentially the same result regarding the issue in question, so that application of either law will produce the same result, there is no need to apply a choice-of-law analysis. [Citation.] In the absence of a conflict in the relevant laws of the two states, the law of the forum state applies.' " *Id.* (quoting *Gleim v. Roberts*, 395 Ill. App. 3d 638, 641 (2009)).

Because Illinois and Florida law both look to section 682 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 682 (1977)) to define what constitutes an abuse of process, the trial court should have applied Illinois law here. Under the law of either state, the outcome is the same.

¶ 57    Abuse of process is defined as the "misuse of legal process to accomplish some purpose outside the scope of the legal process itself." *Selby v. O'Dea*, 2020 IL App (1st) 181951, ¶ 60. A claim for abuse of process requires the plaintiff to plead facts showing that "the defendant instituted proceedings against the plaintiff for a purpose 'such as extortion, intimidation, or embarrassment.' " *Id.* (quoting *Kumar v. Bornstein*, 354 Ill. App. 3d 159, 165 (2004)). "The second element requires proof that the process was used to accomplish some result that is beyond the purview of the process." (Internal quotation marks omitted.) *Id.* "The elements are strictly construed, as the tort of abuse of process is not favored under Illinois law." *Kumar*, 354 Ill. App. 3d at 165-66.

¶ 58    We find that Oppenheim's claim fails because his complaint does not satisfy the second element of an abuse of process claim, which requires proof "that the process was used to accomplish some result that is beyond the purview of the process." *Id.* at 165. Here, the express purpose of M&C's lawsuit against Oppenheim and BLF was to enjoin them from "representing any entity in a case alleging class-wide allegations substantially related to the [Buccaneers

litigation]" based on Oppenheim's breach of his fiduciary duty to them. Therefore, M&C's lawsuit against Oppenheim constituted a proper use of process. See *Community National Bank in Monmouth v. McCrery*, 156 Ill. App. 3d 580, 583-84 (1987) (finding no abuse of process because plaintiff initiated justified foreclosure proceedings against defendant and "[i]t was not used to compel the defendants to do some collateral thing which they could not legally be compelled to do") The fact that A+W would also benefit if Oppenheim (and BLF) were prevented from representing a different class against the Buccaneers does not change the fact that M&C instituted proceedings against Oppenheim for a legitimate purpose. *Holiday Magic, Inc. v. Scott*, 4 Ill. App. 3d 962, 967 (1972) (legitimate use of process, "even with a malicious intent or motive," is not an abuse of process); *Villarreal v. Arnold*, No. 16 CV 00603, 2016 WL 7374272, at *3 (N.D. Ill. Dec. 20, 2016) ("filing a legitimate lawsuit to use as leverage in negotiating an outcome in another lawsuit *** would not support a claim for abuse of process") Therefore, we affirm the trial court's dismissal of Oppenheim's abuse of process counterclaim.

¶ 59                                III. CONCLUSION

¶ 60    For the foregoing reasons, the judgment of the trial court is affirmed on the trade secrets, spoliation of evidence, and abuse of process counts. The judgment of the trial court is reversed on the breach of fiduciary duty count, and we remand for a trial on the merits of this claim.

¶ 61    Affirmed in part and reversed in part.

*Brian J. Wanca, J.D., P.C. v. Oppenheim*, **2023 IL App (1st) 220273**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-08373; the Hon. Margaret Ann Brennan and the Hon. Mary Colleen Roberts, Judges, presiding. |
| **Attorneys for Appellant:** | Jeffrey A. Soble, Lauren M. Loew, and Patrick J. McMahon, of Foley & Lardner LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Robert A. Chapman and Shannon T. Knight, of Chapman Spingola, LLP, of Chicago, for appellee. |