BURT DICKENS & COMPANY, Plaintiff-Appellee, v. JAY BODI, Defendant-Appellant.

First District (5th Division) No. 85—0275

Opinion filed June 6, 1986.

Mass, Miller & Josephson, Ltd., of Chicago (Cary S. Fleischer, of counsel), for appellant.

William T. Dwyer, Jr., of Burke, Griffin, Chomicz & Wienke, P.C., of Chicago, for appellee.

JUSTICE LORENZ delivered the opinion of the court:
Plaintiff brought this action to enjoin defendant from using and

enjoying the benefits of an alleged protectable business interest. After conducting a hearing on the matter, the trial court found that plaintiff's customer expiration lists, which were confidential in nature, constituted a protectable trade secret under the laws of this State, and that defendant had wrongfully misappropriated one of said lists in breach of his fiduciary duty. As a result of these findings, the court enjoined defendant from soliciting plaintiff's accounts for a period of one year. On appeal defendant alleges that: (1) absent a confidentiality or noncompetition covenant agreement, plaintiff's customer expiration lists do not qualify as a trade secret; (2) the finding that a misappropriation of a customer expiration list had occurred was against the manifest weight of the evidence; (3) plaintiff failed to show the prerequisites for the granting of preliminary injunctive relief; and (4) the preliminary injunction order was overly broad in scope.

For the following reasons we affirm.

Plaintiff is an insurance agency specializing in general aviation insurance. It has rendered a full line of insurance services to the aviation industry since 1939. The defendant was employed by plaintiff for approximately seven years during which time he was promoted from the position of salesman to that of vice-president and agency manager in charge of operations.

Plaintiff services around 1,600 customers. As part of its business, plaintiff maintains and periodically compiles what is known in the trade as a customer expiration list. Aside from containing such pertinent information as the account's name, number, type of policy, insurance carrier, amount of premium, salesperson in charge, and billing procedure, the list gives advance notice of all accounts due to expire in a certain period, a data considered of extreme importance in the insurance business. The value of knowing a policy's expiration date, according to defendant, lies in the well-proven fact that a competitor stands a greater chance of winning over an account if contact with the customer is made a month or two prior to renewal rather than immediately after renewal.

As an agency operations manager, the defendant routinely received each month from plaintiff's parent company a partial expiration list covering exclusively those accounts handled by his particular agency. It was defendant's duty thereafter to distribute to salespersons working under his supervision only that portion of the list containing renewal information relating to accounts for which that particular individual was responsible. Since expiration lists are considered to be primary tools in soliciting customers for renewal business, only employees whose jobs required them to refer to this information were

given limited access to the lists.

In the course of his employment with plaintiff corporation, defendant compiled an extensive handwritten list of hundreds of plaintiff's customers, gathering said information from the company's expiration lists, computer, and files. Defendant's list contained pertinent information on each of the accounts, including the policies' expiration dates. When James Flanagan, the owner of plaintiff's parent company, discovered the list quite by accident and confronted defendant with it, the latter explained that the list had been compiled because he was afraid of being terminated by plaintiff. Defendant conceded the list would have served to facilitate the solicitation of plaintiff's customers for defendant's own business when he left the company's employ, whether by choice or by force. After being reminded by Flanagan that plaintiff's expiration list was a company asset, confidential and that no copies should be made, defendant promised that he would not make any such list in the future. The handwritten list was thereafter torn by Flanagan and placed in the wastebasket.

Approximately three months after the aforementioned incident took place, defendant voluntarily left the employ of plaintiff without giving his superiors any advance formal notice. Defendant allegedly left the company because he was unhappy with the compensation. Shortly thereafter defendant opened his own aviation insurance agency. By defendant's own admission, his agency was in direct competition with plaintiff corporation. It is undisputed that the majority of defendant's accounts during his first month in business, including the larger policies, were prior customers of plaintiff's. The evidence adduced at the hearing on plaintiff's motion for injunctive relief further showed that most of these accounts were up for renewal the same month that defendant's agency came into existence.

Defendant, while conceding that he solicited customers whom he had personally come in contact with over a period of years at plaintiff corporation, categorically denies having used an expiration list to obtain any of the accounts. Rather, he maintains that he was able to recall the names of customers whom he previously serviced at plaintiff corporation, either from memory or by reviewing the publicly available list of owners of registered aircraft. The accounts lured away from plaintiff were thus either close friends or business partners, obtained through brokers or by means of using the aforementioned public lists.

Plaintiff contends that it is impossible through normal attrition and loss of business to competitors to lose so many customers and ac-

counts to one agent in a 30-day period. According to plaintiff, defendant would have had to require a copy of plaintiff's expiration lists to successfully solicit that number of accounts. Convinced that defendant had misappropriated the company's customer expiration lists and was using said lists to compete with his former employer, plaintiff instituted this action. On December 28, 1984, the trial court granted plaintiff's motion for injunctive relief finding, among other things, that defendant had wrongfully taken customer lists whose confidentiality plaintiff had taken precaution to guard.

The question of whether injunctive relief should be allowed to prevent a former employee from using information obtained during his employment or from soliciting the employer's customers for his benefit has been addressed by a number of Illinois decisions. The context in which this question has risen has been that of an employer seeking either to enforce a noncompetition or restrictive covenant agreement or to prevent the use of a customer list for solicitation purposes on the basis that a trade secret is involved. The fundamental issue in all such cases is whether the party seeking injunctive relief has a certain and clearly ascertainable property right or business interest which needs protection.

■ Although the policy of Illinois courts has generally been to encourage competition in the business sector in order to avoid the restriction of any employee's freedom and the possibility of industrial servitude (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393), they have found it equally imperative to recognize a protectable business interest where a trade secret exists and either a restrictive covenant agreement has been executed or a breach of confidentiality by an employee has occurred in the course of his employment. (*Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 228 N.E.2d 742.) The general rule emerging from these cases is that while an employee, at the termination of his employment, can take with him general skills and knowledge acquired during the course of his employment, he may not take confidential particularized information disclosed to him during the time the employer-employee relationship existed which are unknown to others in the industry and which give the employer advantage over his competitors. *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 212 N.E.2d 865; *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795.

■ Adherence to these principles requires that we determine first whether plaintiff's customer expiration list constituted a trade secret, and second, whether defendant wrongfully misappropriated the trade

secret in breach of his confidential relationship with plaintiff.

Generally, a trade secret has been defined as, "[A] plan or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it." (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 385, 212 N.E.2d 865, 868; *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 545-46, 132 N.E.2d 806, 811.) However, because it is difficult in most cases to extract from such a broad definition the possible objects of trade secrecy, the courts have found it useful, in determining whether a certain plan, process, or informational data qualifies as a *bona fide* protectable business interest, to analyze the matter in terms of the following: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393; *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 425 N.E.2d 1034.

In the instant case, the information contained in plaintiff's customer expiration lists was not available to plaintiff's competitors. While there are publicly available lists of registered aircraft owners, these lists do not contain any information regarding insurance coverage, including the exact expiration date of the owner's policy. Accordingly, the registration date found in the publicly available lists, being at best only within a couple of months of the policy expiration date, would not have provided defendant with the crucial information needed to win over plaintiff's accounts before renewal occurred.

Further, the customer expiration lists were available only to employees whose job required them to work with said lists. As one of four subsidiary corporations, plaintiff received periodically from its parent company its own customer expiration list. Only information pertaining to those accounts handled exclusively by plaintiff agency was included in the list. With the exception of the operations manager and the supervisor of personnel service, all employees in the agency were severely restricted from having access to the list. The operations manager was given instructions to distribute, to the salesmen working under his supervision, only that portion of the list containing the expiration dates of policies which that salesman was responsible to renew. The supervisor of personnel service was required to divide the

list alphabetically prior to distributing the corresponding portions to clerical employees in charge of inputting data regarding renewals into the computer. Moreover, none of the employees of any of the other subsidiaries had access to plaintiff's expiration lists.

Numerous precautions were additionally taken by plaintiff to guard the confidentiality of its customer lists. The information contained in the lists was stored in a computer and could only be obtained by use of a secret code. The code was known to no one except the main computer operator. As an extra safeguard, the lists were printed only one month at a time, approximately three months in advance. Every employee was told when hired that the expiration lists were the confidential property of plaintiff's and that the information contained therein could not be disclosed to any person or be removed from the office. After discovering that defendant had copied some of the confidential information for his own use, plaintiff took further steps to guard the secrecy of its lists by stamping them with a legend reciting their confidentiality. Finally, plaintiff instructed its own cleaning crew to remove all computer generated records from the office's wastebaskets and transfer them to the computer department where they could be shredded and disposed of accordingly.

The value of the expiration lists to plaintiff, as well as its competitors, is obvious. As defendant himself acknowledges, the renewal of existing insurance policies is the most important part of the insurance agency business. By all accounts, this cannot be accomplished on a large scale without the aid of a customer list. Clearly, the success of the business ultimately depends on the wealth of the list compiled. However, a customer list is compiled only gradually and with time. This factor alone may place a newcomer at a great disadvantage with his more established competitor when soliciting accounts. It is not surprising then that such lists come to be regarded as valuable proprietary documents and great precaution is taken to safeguard their confidentiality.

While no evidence was presented with respect to the expense incurred by plaintiff in developing its expiration lists, the effort spent to compile and maintain the data and the overall value which said information represented to the company, is proof enough that a great deal of money was spent by plaintiff to acquire, develop and maintain such lists. Purchased as assets when plaintiff was made a subsidiary in 1974, the lists have been routinely updated each month and its data stored in the parent company's computer where new lists are generated each year. This procedure alone involves the concerted efforts of clerical employees, sales staff, computer operators, and the computer

itself.

Finally, the task of gathering all the relevant information necessary to duplicate plaintiff's expiration lists is monumental. As previously mentioned, plaintiff's customer expiration lists contained the names, policy expiration dates, identification of insurance carriers, types of policies and premium charged for each of their 1,600 customers, all arranged in order of date of expiration. To duplicate these lists, defendant would first have had to select from memory those accounts serviced by plaintiff from a public list of registered aircraft owners. Because said public lists fail to divulge any information regarding insurance coverage, including the all-important policy expiration date, defendant would have had to call each aircraft owner to supply him with the pertinent data. However, before this could even be accomplished, it would have been necessary to get the telephone numbers of those clients, assuming they were listed, by consulting hundreds of directories or long-distance directory assistance. The foregoing leaves this court with no doubt that plaintiff's expiration lists took a form different from ordinarily acquired general information and that its business value was derived from the difficulty of obtaining the information itself.

Accordingly, we must conclude that the evidence in the record supports the trial judge's findings that plaintiff's expiration lists constitute a trade secret.

■ Because it is impossible for a trade secret to be obtained through legal means (see *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393; *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 212 N.E.2d 865), it is important to determine, where a customer list or customer information constitutes a trade secret and no restrictive covenant exists, whether the employee obtained the trade secret through a breach of confidentiality. It is well established that an employee breaches his confidential relationship with his employer where he acts in a manner inconsistent with his employer's interest during his employment in that he surreptitiously copies or memorizes trade secret information for use after his termination in the solicitation of his employer's customers. (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393; *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 212 N.E.2d 865; *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 228 N.E.2d 742.) Moreover, an employer is entitled not to have his old customers enticed away from him under Illinois law. See *Snyder v. Hamilton* (1963), 39 Ill. App. 2d 352, 365, 189 N.E.2d 97, 103.

The record in the instant case shows that defendant was consider-

ing leaving plaintiff's employ as early as August 1984, two months prior to handing in his resignation. At that time, defendant confided to Mike Cummings, vice-president of plaintiff's parent company, that he was considering a couple of offers. One of these offers consisted of forming his own aviation insurance agency in partnership with Edward Wachs, one of plaintiff's former accounts. During his conversation with Cummings defendant even bragged that he could probably take 90—95% of the accounts with him in the event he left plaintiff's employ since their loyalty was to him personally and not the company.

Concurrent with these events, defendant began to compile a handwritten list of selected clients served by plaintiff. On this list he noted the account's name, telephone number, carrier, policy expiration date, and aircraft registration number. The evidence strongly indicates that defendant compiled this information from plaintiff's expiration lists and insurance files. Defendant alleges he made the list because he feared he would be terminated by plaintiff. If such were to happen, defendant would use the list to solicit plaintiff's customers. However, it was defendant who, out of his own volition, handed plaintiff his resignation and shortly thereafter opened his own aviation insurance agency.

Before leaving plaintiff's employ, defendant had promised Flanagan, at the time the latter accidentally discovered and confronted him with the handwritten list, that he would respect the confidentiality of plaintiff's expiration lists and would refrain from resorting to conduct which could lead to a misappropriation in the future. The quickness with which defendant successfully solicited plaintiff's clients for his new business following his resignation, however, raises the question whether defendant actually honored his promise not to take and use plaintiff's expiration list for his own benefit.

A review of the record indicates that defendant, in fact, failed to keep his promise. The first clue to his true intentions can be gathered from the manner in which he left plaintiff corporation. Defendant first told Flanagan that he had no plans of leaving Dickens, yet he had been discussing for some time with Wachs the opening of a competing agency. He next misled Craig Nelson, the president of plaintiff's parent company, by telling him that he was going into the aircraft leasing business when, in fact, his intentions were to start his own insurance agency. Defendant then abruptly handed his resignation without giving his superiors any notice, leaving plaintiff with no time in which to notify its customers that defendant would no longer be handling their accounts. The evidence strongly suggests that this might have been done by design, since the day following his resignation defendant be-

gan to solicit those clients of Dickens' whose policies were due to expire in November and early December.

Further, it is somewhat significant that in approximately a month's period defendant was able to successfully solicit 21 of plaintiff's customers convincing them to renew their policies with his new agency instead of Dickens'. The record shows that of the 33 accounts which defendant admitted to having as of November 30, 1984, 26 were taken from plaintiff corporation.

Defendant has advanced several explanations accounting for his success in soliciting plaintiff's November and December renewals. Defendant first contends he was able to compete for Dickens' renewal business by relying on his personal relationship with the customers and his knowledge of the expiration dates of their policies. According to defendant, it was his good memory retention which enabled him to remember the specific expiration dates for many of plaintiff's accounts. However, when asked at his deposition to name those accounts whose expiration dates he allegedly remembered defendant could only recall five names and for those he could not be more specific than the month of expiration. For the month of October alone, the month for which he had just completed reviewing policies, he could only recall the name of one customer whose insurance had been renewed.

Defendant additionally claims to have been able to recognize the names of clients serviced by plaintiff when paging through the publicly available lists of registered aircraft owners. He then presumably contacted the client on the telephone and directly obtained from the individual all the information he needed to know regarding his policy. We find little to substantiate this explanation since, as previously noted, not only is there a logistic problem in carrying out this task, but defendant during cross-examination himself admitted that as of the end of November, he had not used any of the public lists of registered aircraft owners to solicit any of plaintiff's former accounts.

There is no doubt that the number of accounts that a former employee can take without an expiration list depends to a great extent on how good the employer's memory is. While it seems possible that defendant or any other agent would be able to recall from memory random names of accounts, it is difficult to believe that he would also be able to remember the exact expiration dates of their policy. The foregoing evidence amply shows that defendant could not have successfully relied on either his long-term or short-term memory. Moreover, the proximity of the solicitation to the expiration date further casts a doubt on defendant's claim that he was able to compete for

Dickens' renewal business on the strength of his memory. Indeed, to successfully solicit, as defendant did here, 24 accounts. of which 21 were renewals, in a 30-day period without the aid of a customer expiration list seems nearly impossible. Accordingly, we find defendant's arguments to lack in credibility and therefore hold that the trial court properly determined on the basis of the evidence presented that defendant misappropriated plaintiff's customer lists.

■ Defendant next argues that since the remedy at law in the instant case is adequate plaintiff failed to establish the necessary requisites for the granting of preliminary injunctive relief. Defendant bases his argument on the theory that the amount of commission lost on any of plaintiff's accounts is quantifiable. According to defendant, the value of each customer successfully solicited by him can be measured by one year's commissions, since each policy is a one year policy and plaintiff receives, as commission, a percentage of the yearly premium. We find this argument to lack merit. First, defendant ignores that this plan would not take into account those customers that would have stayed with plaintiff for 2, 5, 10 or, for that matter, an indeterminate number of years. Second, as defendant himself has admitted, the greatest source of new business in the aviation insurance industry is referrals from existing customers. If defendant were allowed to solicit plaintiff's customers by using the latter's expiration lists, there would be no way of measuring the loss of referral business from those customers. The proper remedy in cases of misappropriation is to enjoin the former employee from competing for the customers whose names are contained on the expiration list. (*Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795; *Holsinger, Theis & Co. v. Holsinger* (1946), 329 Ill. App. 460, 69 N.E.2d 360.) Such a relief is especially appropriate where there is no adequate remedy at law. The damages suggested by defendant are inadequate because they are speculative and impossible to measure. The granting of preliminary injunctive relief to plaintiff was therefore proper.

■ Defendant lastly contends that the scope of the preliminary injunction issued by the court is overbroad because it prohibits him not only from using the expiration lists but also from soliciting any of Dickens' accounts with the aid of other sources. We disagree. Since the court would have no way of knowing if defendant was using the expiration lists to solicit Dickens' accounts, it is not difficult to justify the blanket prohibition of such solicitation even if carried out with the aid of sources other than the lists. The order does not prohibit defendant from competing with Dickens for aviation insurance customers, as

long as they are not already listed in plaintiff's expiration lists. It also does not prohibit defendant from contacting new business. Moreover, the record shows that the trial court made provisions in its order for defendant to exempt from its prohibition those customers found to have been referred by insurance brokers who desired to send defendant business. Submission of a list of such customers to the court would have allowed defendant to avail himself of the exemptions. The court also suggested in its oral ruling that if defendant would produce evidence of those accounts with whom he had had a personal relationship, the court would consider modifying its order to exclude them from the prohibition. Defendant in both instances declined and instead chose to file this appeal. Under the circumstances of this case, the scope of the prohibition imposed by the court was not unreasonable.

The judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P.J., and PINCHAM, J., concur.