2026 IL App (1st) 252077-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
February 9, 2026

No. 1-25-2077

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| WILLOW INSURANCE GROUP, INC., | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellants, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | No. 25 CH 2397 |
| PAVLO BONDARENKO a/k/a Paul Bondarenko, | ) | |
| GALINA BARASH, STEVEN MIKUZIS, and POWER | ) | The Honorable |
| RISK MANAGEMENT SERVICES LLC, an Illinois | ) | William B. Sullivan, |
| Limited Liability Company d/b/a Power Risk Insurance, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

## ORDER

¶ 1     *Held:* The trial court's order denying the preliminary injunction sought by the plaintiff is affirmed.

¶ 2     The plaintiff, Willow Insurance Group, Inc. (Willow), appeals following the trial court's denial of a preliminary injunction sought by it to prevent two departed employees, defendants Pavlo Bondarenko and Galina Barash, from using certain customer lists and information that it claimed were trade secrets in their work as insurance agents on behalf of their new employers,

defendants Power Risk Management Services, LLC (Power), and Steven Mikuzis. We affirm the trial court's denial of the preliminary injunction.

¶ 3                                           BACKGROUND

¶ 4      This is the second time that this case has come before this court. By a prior summary order, this court affirmed the trial court's entry of a temporary restraining order (TRO) concerning the same alleged trade secrets that are the subject of the instant motion for preliminary injunction. The TRO was entered based upon Willow's verified complaint, which alleged that the defendants had misappropriated trade secrets in violation of the Illinois Trade Secrets Act (765 ILCS 1065/1 *et seq.* (West 2024)) after Willow terminated Barash's employment on August 15, 2024, and Bondarenko voluntarily left his employment there on November 22, 2024. Both were hired by Mikuzis to work at Power as insurance agents after they left Willow.

¶ 5      Willow's verified complaint alleged that after it terminated Barash, she disobeyed Willow's instructions to return client files and information belonging to Willow that she had taken home prior to her termination. It also alleged that following her termination, Willow had created a document titled "Galina's Clients" that contained contact information—names, phone numbers, addresses, and e-mail addresses—for Willow's clients. The verified complaint alleged that access to this client list was restricted to Willow's president (Rebecca Barens) and three employees. One of the employees with whom that client list was shared was Bondarenko. The reason it was shared with him was because, following Barash's termination, he was given the responsibility of retaining Barash's clients as customers of Willow. His access to the list was through a computer provided to him by Willow. However, on two instances during the week before Bondarenko gave his two-weeks' notice that he was leaving Willow, he downloaded the client list and either saved it externally or printed it. After he left his employment, Willow discovered that he had used the client

list to help transfer Willow's clients to Barash at Power. This included initiating calls to clients who had not asked to change insurance agents and soliciting them to do so.

¶ 6     Willow's verified complaint alleged that all four defendants had acted in concert to induce over 100 of Willow's customers, with more than 150 insurance policies, to transfer their business from Willow to Power. The value of this book of business is approximately $421,000. Willow alleged that this result could not have been achieved without the defendants' misappropriation of Willow's client list and other information kept by Barash, which constituted trade secrets. Willow's verified complaint sought temporary and permanent injunctive relief to require the return of its files, information, and client list and to prevent further use of that information by the defendants. It also sought a money judgment for violation of the Trade Secrets Act.

¶ 7     As stated, the trial court granted a TRO in favor of Willow, finding that its verified complaint raised a fair question as to its client list constituting a trade secret. In doing so, it acknowledged that although the parties had opposing viewpoints about the source of the contact information that Barash had used to contact clients after she went to work at Power, the defendants had not raised these facts in either a verified pleading or signed affidavit. This court held by summary order that the trial court's assessment was not unreasonable and that therefore its granting of the TRO was not an abuse of discretion.

¶ 8     The case thereafter proceeded to an evidentiary hearing on Willow's right to a preliminary injunction. This evidentiary hearing occurred over the course of three days and involved the testimony by Barash, Bondarenko, Mikuzis, and Barens.

¶ 9     On adverse examination, Barash testified that she had been working in the insurance industry for 28 years, first as a customer service representative and later (since 2012) as an agent. Over those years, she built a clientele of individuals who primarily spoke Russian, Ukrainian, Polish,

and Bulgarian through her involvement with churches, real estate agents, and banks that served those groups. Because of those relationships, many of her customers have followed her for their insurance needs regardless of the agency by which she was employed. Throughout that time, she has kept a handwritten record of her clients' names and phone numbers in a black three-ring binder. Sometimes she also records their e-mail addresses, notes about them, and their policy numbers and effective dates, but not mailing addresses. She refers to this binder as her "black book." She keeps the book at her home and has never taken it to her office. She did not need it at the office because she had all her clients' contact information in the paper files kept there. However, she sometimes works and needs to reach clients on Saturdays and Sundays. She also worked from home on Wednesdays and Fridays. Her job as an agent involves keeping track of clients' policy renewal dates and calling them if, for example, they fail to make a payment or have a mortgage change.

¶ 10        Barash testified that Willow became her employer on April 1, 2023, when it purchased First Midwest Insurance Agency (First Midwest), which had been her employer since 2015. Her last day of employment with Willow was August 15, 2024. She testified that both First Midwest and Willow used a computer program called EZLynx for purpose of obtaining quotes and servicing policies. To obtain quotes for coverage in EZLynx, she would input the insured's name, date of birth, driver's license, e-mail address, and phone numbers. She was able to access EZLynx from her home computer as well as in the office. She did not need a password to use EZLynx.

¶ 11        After Willow terminated Barash's employment, one of her account representatives recommended that she reach out to Mikuzis about employment at Power. On August 19, 2024, she e-mailed Mikuzis and told him, "I have my own book of business that I really want to put in good hands." She was referring there to the Russian, Ukrainian, and Polish-speaking clients with whom she had maintained relationships over many years. When she met with Mikuzis, she took her black

book to the interview to show the extent of her client list, but it was not opened. She started employment with Power in mid-September 2024. However, clients had been calling her cell phone since the time she was fired from Willow. Thus, once she knew she was going to be working for Power, she began having clients compete agent-of-record and broker-of-record change forms, the earliest being September 3, 2024. She obtained clients' mailing addresses for use on these forms simply by asking the clients, since she did not keep mailing addresses in her black book. Barash testified that in addition to her black book, she possessed eight years' worth of lists of First Midwest's customers that its previous owner, Robert Smith, had given to her for the purpose of establishing her annual salary. She had similar client lists going back to 2013 from her employer prior to First Midwest.

¶ 12    On examination by her own counsel, Barash explained that she immigrated to the Chicago area from Ukraine when she was 35 years old. She was now age 63. When she began working for First Midwest in 2015, she brought her Russian, Ukrainian, and Polish-speaking clients with her; she never had any sort of restrictive covenant while working at First Midwest because nobody else working there spoke the languages to serve that client base. Her black book was introduced into evidence, and she testified that she had been using it to service her clients for many years.

¶ 13    She testified that when First Midwest was sold to Willow on April 1, 2023, she had no idea that this was going to occur and had no part in the negotiations. At that time, nobody said anything to her about returning any records. Nobody from Willow asked her anything about how she kept records of her clients. She never signed any restrictive covenant, noncompete agreement, or nonsolicitation agreement with Willow at any time. She testified that on August 15, 2024, Barens met with her via Zoom to terminate her as an employee of Willow; however, in that same conversation, Barens offered her $25,000 to buy her book of business and have her sign a

nonsolicitation agreement. Barash did not agree or sign the proposed agreement. She returned her office keys the following Monday morning, and nobody asked her at that time about returning her black book or any documents she had received in prior years from Robert Smith of First Midwest.

¶ 14     Barash explained that she first met Bondarenko around May or June 2024 because she needed assistance serving her clients, and he spoke Ukrainian, Russian, and English. She also believed he would be capable of the job because he had been a practicing lawyer for 17 years in Kiev, Ukraine, before he left due to the war there. She thus helped him get a job at Willow as a customer service representative. She eventually made his introduction to Mikuzis to help him get a job at Power also. After she left Willow, she never asked Bondarenko to bring her any documents, information, or information from Willow. She testified that sometime in November 2024, after Bondarenko came to work at Power, he gave her a paper that was a list of her clients from Willow. She testified that she never used that document because she already had all the contact information for her clients in her black book.

¶ 15     On recross, Barash agreed that she had written some entries into her black book during the time that she was employed by Willow.

¶ 16     Bondarenko was the second witness, and he testified on adverse examination that he began employment with Willow on July 15, 2024. He had been introduced to Barash earlier that month by some Ukrainian-speaking friends, and he had applied for a job as a customer service representative at Willow after Barash told him she was looking for someone to assist her. He was never given any employment manual when he started working for Willow. He was given a laptop computer with access to a program called EZLinks. On August 7, 2024, Barens sent him an e-mail attaching a nondisclosure form. That e-mail stated, "The non-disclosure doesn't restrict you to working for us, you just can't steal our customers." He was also given a personnel agreement;

although he did not return a signed copy of it to Willow, he acknowledged this was unintentional. When he started working for Willow, the plan was that he would take the necessary courses to obtain licensure as an agent. He completed the courses two days before Barash was fired.

¶ 17     After Barash was fired from Willow, Bondarenko's employment there became very stressful. Another employee had left the following week, leaving only Bondarenko and another Ukrainian named Lana, who worked only a few days a week until she quit soon thereafter. Thus, Bondarenko was new to the United States, new to the insurance industry, and essentially doing by himself a job that had previously been done by three people. He testified that Barash's clients would call Willow asking questions that he was unable to answer or raising time-sensitive insurance needs such as real estate closings. Barash also called him a few times and asked him to take actions to service policies, but he did not think it was appropriate to take direction from her once she was no longer working for Willow. He stopped taking phone calls from her and only spoke to her a couple of times after she left Willow. He did not give Barash's phone number to clients who called Willow looking for her. Barens told him to do his best to be helpful to Barash's former clients so that they stayed with Willow.

¶ 18     Around Labor Day of 2024, Barash introduced Bondarenko to Mikuzis, who is a lawyer in addition to running an insurance agency. Bondarenko told Mikuzis that he was not happy in his job at Willow, and Mikuzis responded that Power could consider employing him after he obtained his agent license. He testified that although Willow paid for his two-day class, Bondarenko paid for his own agent exam and license. On October 14, 2024, he informed Mikuzis that he had obtained his license.

¶ 19     On November 8, 2024, Bondarenko provided his two-weeks' notice to Barens, although he did not tell her he was going to work for Power. On two occasions the week prior to doing this, he

printed a spreadsheet from Willow's computer system titled "Galina's Clients." He testified that he did this because he used it in his work for Willow and continued to do so until his last day working there. When he left Willow on the last day, he took that spreadsheet with him. He did not have a specific purpose for keeping it and did not think he was doing anything wrong or illegal by keeping it. He gave the spreadsheet to Barash on his second or third day of working for Power.

¶ 20        On examination by his own counsel, Bondarenko testified that during the brief time he worked with Barash at Willow, she had told him that Willow's Ukrainian-speaking clients were her clients; however, he did not know whether she was just saying this, and he had no particular reason to help her after she was fired. He testified that on November 1, 2024, Barens had sent him a Slack message suggesting he call the people whom Willow considered Barash's clients to help retain them as customers of Willow. He received access to the "Galina's Clients" spreadsheet for that purpose. He testified that through his last day working for Willow, Barash never asked him to give her any data or documents from Willow. Likewise, neither Mikuzis nor anyone else from Power asked him to bring them any data or information from Willow. He did not take any electronic files from Willow when he left. He was not given instructions by anyone at Willow as to what he should do on his last day; Barens did not come into the office that day or otherwise contact him. The list of Barash's clients that he kept after leaving Willow was an eight or nine-page document from Google Sheets with names, phone numbers, e-mail addresses, and residence addresses of certain clients. He does not know what Barash did with it after he gave it to her.

¶ 21        Mikuzis was the third witness. He testified on adverse examination that he is an Illinois licensed attorney. He also holds various licenses in the insurance industry and established Power in 2017. He testified that he first met with Barash around August 20, 2024. She brought her black book to that meeting to demonstrate the extent of her book of business, but it was not opened at

the meeting. After speaking with her, he agreed that Power could hire her to help her since she had recently been fired. He met Bondarenko also around the end of August and told him that Power could consider hiring him if he obtained producer licenses. On September 3, 2024, Barash stated to Mikuzis in an e-mail that it would take her a few months to get broker-of-record letters processed; those are forms used by insurance carriers to determine which brokerage receives a commission for an insured's policy. Obtaining these letters is a matter of contacting the client and getting their permission to process the change in agent or broker.

¶ 22    On October 14, 2024, he received confirmation from Bondarenko that he had passed the property portion of the state producer licensing examination. He made an offer of employment to Bondarenko sometime the following month. He was asked about the document titled "Galina's Clients" that Bondarenko had kept after leaving his employment with Willow, and Mikuzis testified that he had never seen it prior to litigation. Asked if having such a list of clients and their contact information would be helpful in soliciting clients to get broker-of-record letters, he answered that it would be no more helpful than working through public records to obtain clients' phone numbers, e-mail addresses, and mailing addresses, which were readily available to anybody with Internet access. He testified that knowing the expiration dates for a client's policy would be helpful in knowing when to contact them to obtain broker-of-record letters.

¶ 23    On examination by codefendants' counsel, Mikuzis testified that there were multiple tools available to an agent selling personal lines insurance to obtain people's contact information. One paid service is called Spokeo, which provides complete home addresses, e-mail addresses, and phone numbers. Salesgenie is a similar service. Crexi provides residence owners and complete title search results. Lexis is used by most insurance agencies and provides a significant amount of contact information and other information about individuals. Mikuzis also testified that the

"Galina's Clients" document was nothing he had ever used for the business of Power or himself. He testified that the only information on that list was names, addresses, phone numbers, and e-mail addresses; a list with that kind of information has no value to an agency such as Power because the product it brokers—home and automobile insurance—is ubiquitous, such that every person who owns or rents a home and drives a car is a potential customer for that insurance.

¶ 24    Barens was the final witness to testify at the evidentiary hearing. She testified on direct examination that she was Willow's founder and president. Willow purchased First Midwest in April 2023, and the asset purchase agreement stated that Willow was purchasing its "customer and contact lists, including names, addresses and telephone numbers" along with its business records and files. At the time of purchase, First Midwest's annual revenue from customers for whom Barash was producer was $258,872, with its total annual revenue being $450,000. Although Willow purchased First Midwest for $600,000, litigation ensued that resulted in a settlement whereby Willow paid only $30,000 to its seller Robert Smith. However, she testified that Willow spent a total of $279,000 associated with the acquisition of First Midwest.

¶ 25    On April 9, 2024, Barens' husband sent an e-mail to Barash directing her to Willow's employee handbook, which stated *inter alia* that Willow's employees "are required to protect the confidentiality of Agency trade secrets, proprietary information, and confidential commercially-sensitive information (i.e. *** customer lists ***) related to the Agency." She testified that Willow considers customers' names, phone numbers, driver's license information, birth dates, and policy information to be confidential. To maintain the confidentiality of its information, Willow has a password-protected management system, called EZLynx, where all client information is held; each employee has their own login, which allows them to access only certain areas. None of Willow's employees have access to run reports or the ability to run a report of a client list. If employees need

a list of their clients, they have to ask Barens. Willow also uses Google Drive and limits employee access to files in it through password protection. Barens testified that it would be very valuable for a competitor of Willow to obtain a list of its customers, their contact information, types of coverage, and policy expiration dates because that information is not available anywhere.

¶ 26     Barens testified that Willow terminated Barash's employment because it did not make financial sense to retain her. Her August 15, 2024, e-mail to Barash instructed her by August 26, 2024, to return her office key and phone and "[t]ake any personal belongings, leaving all other items including files, as they belong to Willow." Willow also made her a nonsolicitation offer in that e-mail, which she did not accept. Between Barash's termination and May 21, 2025, Willow received forms changing the agency of record to Power for 390 customers and 557 policies.

¶ 27     She testified that on October 31, 2024, Willow first gave Bondarenko access to a spreadsheet including the names, phone numbers, and e-mail addresses of clients that Barash had previously serviced. This spreadsheet was password protected, and he did not have access to it without Barens giving it to him. The purpose of giving him access was so that he could contact these clients, make sure they had Willow's contact information, and ask if they needed anything. An exhibit was admitted showing that Bondarenko downloaded this document two times, first on November 1, 2024, and again on November 7, 2024. The spreadsheet, which was admitted into evidence, included clients' names, addresses, e-mail addresses, phone numbers, policy premium amount, and notes about whether Willow had been able to reach them. On November 8, 2024, she received a Slack message from Bondarenko stating that he was giving two weeks' notice. He worked at Willow until November 22, 2024. She learned in December that he was working for Power.

¶ 28     Barens also identified five additional lists of First Midwest's clients, which she later discovered, through discovery in the present litigation, that Barash had kept in her possession.

These lists were from 2017 through 2020. They included the clients' names and various information about their policies in place for that year. Some of those lists also included the clients' phone numbers and e-mail addresses. In addition to those five lists, three more lists in Barash's possession of clients with polices through Progressive Insurance in 2020 and 2021 were also identified; these included clients' names, mailing addresses, e-mail addresses, phone numbers, and other insurance information. Barens testified that she believed that these lists were Willow's business records that it had purchased from First Midwest in 2023 pursuant to the asset purchase agreement. Barens testified that she had not authorized Barash to have or retain these lists.

¶ 29    Barens also testified that she first learned through discovery in this litigation that Barash had kept the "black book" that included clients' names and certain contact and insurance information. Barens was not aware prior to litigation that this book existed. Barens testified that she believed Willow was the owner of that book because it contained information acquired while Barash was employed by Willow. She testified that 156 of the entries in the black book were made while Barash was employed by Willow.

¶ 30    On cross-examination, Barens testified that Willow was first formed in 2016. She acknowledged that when Willow terminated Barash on August 15, 2024, she presented a document to Barash titled "Willow Offer for Book." It offered $25,000 in exchange for a noncompete and nonsolicitation agreement. Barens did not believe this was an offer for Barash's book of business, because Barens believed Willow had already purchased that.

¶ 31    Barens testified that she believed that any list of Willow's clients was a trade secret. This included the spreadsheet titled "Galina's Clients" that Bondarenko had taken with him when he left Willow in November 2024. Barens also claimed that all of the other eight client lists identified from 2017 through 2021 constituted Willow's trade secrets, even though Willow did not acquire

First Midwest until 2023. Barens did not know how many of the customers identified on those client lists remained Willow's customers by the time it purchased First Midwest in 2023. She also claimed that Barash's black book was Willow's trade secret for purposes of this litigation. Barens testified that Barash was under no restriction about bringing the clients that she had served at Willow with her to Power, but "[s]he wasn't supposed to steal a client list." She believed that Barash's entire black book was a stolen client list.

¶ 32    Following the evidentiary hearing, the parties submitted written closing arguments. In Willow's closing argument, it identified two documents as constituting protectible trade secrets as to which it was entitled to a preliminary injunction: (1) "the three ring binder in Barash's possession ('Black Book')" and (2) "the information contained in the client list downloaded by Bondarenko ('Galina's Client List')." It did not argue in its written closing—as Barens had testified—that any of the eight other client lists in Barash's possession dating from 2017 through 2021 constituted Willow's trade secrets.

¶ 33    In its written order denying the preliminary injunction and lifting the TRO, the trial court found that Willow failed to raise a fair question that it could satisfy the necessary requirement of showing that either the Black Book or Galina's Client List were "sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use." See 765 ILCS 1065/2(d)(1) (West 2024). The trial court reasoned that these two documents contained client names, e-mail addresses, mailing addresses, and policy numbers that were not sufficiently secret to derive economic value. It found that this information was largely either publicly available or could be purchased. It further stated that to the extent the insurance policy information was not publicly available, it was nevertheless information that could be accessed with a person's name and their permission to run a search. The

trial court cited the Fifth District case of *Rapp Insurance Agency, Inc. v. Baldree*, 231 Ill. App. 3d 1038, 1042-43 (1992), for its recognition that insurance customers readily give their information to competing insurance companies for the purpose of obtaining better deals. The trial court found that because Willow had not shown that it had a clearly ascertainable interest in need of protection, it was unnecessary for it to analyze whether Willow had shown the other factors required to obtain issuance of a preliminary injunction. Willow thereafter filed a timely notice of interlocutory appeal. See Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017).

¶ 34                                                       ANALYSIS

¶ 35        This appeal is before us following the trial court's denial of a preliminary injunction. To establish its entitlement to a preliminary injunction, Willow was required to demonstrate (1) a clearly ascertainable right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 62 (2006). On appeal, we examine whether Willow, as the party seeking the injunction, has demonstrated a *prima facie* case that there is a fair question concerning the existence of the claimed right. *Id.*

¶ 36        We first address our standard of review. In most cases, we apply the abuse of discretion standard of review when evaluating a trial court's granting or denial of a preliminary injunction. *Id.* at 62-63; *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 276 (2005). In this case, however, Willow urges us to apply a *de novo* standard of review on several bases. First, it contends that the trial court's determination that it failed to show a trade secret involved interpretation of the Trade Secrets Act. Although we agree that *de novo* review can be appropriate in cases where a trial court's decision to grant or deny a preliminary injunction involves a question of law such as the interpretation of a statute (*Caro v. Blagojevich*, 385 Ill. App. 3d 704, 709 (2008)), here the trial

court's denial of the preliminary injunction did not involve statutory interpretation. Instead, the trial court was merely applying the statutory definition of "trade secret" to the evidence adduced at the evidentiary hearing. Accordingly, *de novo* review is not warranted on that basis.

¶ 37    Willow's second grounds for urging us to review this appeal *de novo* is its assertion that the facts upon which the trial court relied were undisputed, and *de novo* review applies where a trial court applies the law to undisputed facts. The cases that Willow cites for this principle are not cases involving the issuance of preliminary injunctions. More significantly, we disagree that this case involved only undisputed facts. Rather, the dispute below turned on whether Willow had shown a fair question about whether the customer lists or information at issue qualified as a trade secret under the facts of this case. This was a question of fact that was highly disputed at the evidentiary hearing. See *Liebert Corp.*, 357 Ill. App. 3d at 277 ("Whether customer lists are trade secrets depends on the facts of each case."). It would not be appropriate for this court to undertake *de novo* review of such a fact-dependent determination.

¶ 38    Willow's final argument for applying *de novo* review is an assertion that a trial court's finding that a plaintiff did not make out a *prima facie* case invokes *de novo* review. For this proposition, Willow cites *Keefe-Shea Joint Venture v. City of Evanston*, 332 Ill. App. 3d 163 (2002). However, this court's reference in *Keefe-Shea* that *de novo* review applies to a ruling on the failure to make out a *prima facie* case was a reference to the first prong of the two-part analysis required on a motion for directed finding at a bench trial under section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2000)). *Keefe-Shea*, 332 Ill. App. 3d at 167. The instant case involved an evidentiary hearing, not a trial, and in any event the trial court ruled after hearing all the evidence and closing argument presented by both sides. Thus, *Keefe-Shea* provides no support for applying a *de novo* standard of review to the trial court's ruling in this case. We hold that abuse of

discretion is the appropriate standard for reviewing this appeal. See *Mohanty*, 225 Ill. 2d at 62-63.

¶ 39    To show a clear and ascertainable right in need of protection, the party seeking a preliminary injunction must raise a fair question that it has a substantive interest recognized by statute or common law. *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 331 Ill. App. 3d 777, 788-89 (2002). Consistent with the argument made in its written closing, Willow's argument on appeal is that the evidence presented at the evidentiary hearing raised a fair question that it is entitled to protection under the Trade Secrets Act of (1) the entirety of the "black book" maintained by Barash and (2) the spreadsheet titled "Galina's Clients" that Bondarenko kept after leaving Willow. A trade secret is defined by statute as follows:

> " 'Trade secret' means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

> > (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

> > (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d) (West 2024).

¶ 40    In addition to the statute, courts considering whether a trade secret exists also look to six common law factors: (1) the extent to which the information is known outside of a plaintiff's business, (2) the extent to which it is known by the employees and others involved in a plaintiff's business, (3) the extent of measures taken by a plaintiff to guard the secrecy of the information, (4) the value of the information to a plaintiff and its competitors, (5) the amount of effort or money expended by a plaintiff in developing the information, and (6) the ease or difficulty with which the

information could be properly acquired or duplicated by others. *Liebert Corp.*, 357 Ill. App. 3d at 277. Of these factors, the most important is whether and how an employer has acted to keep the information secret. *Brian J. Wanca, J.D., P.C. v. Oppenheim*, 2023 IL App (1st) 220273, ¶ 33.

¶ 41 Specifically with respect to customer lists and information, our court has recognized that this information " 'will be deemed a protectable trade secret only where the information has been developed by the employer over a number of years at great expense and kept under tight security.' " *Id.* ¶ 34 (quoting *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 574 (1992)). Customer information that is otherwise obtainable from public sources but involved laborious accumulation, culling, or analysis of publicly available information can qualify as a trade secret. *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1091 (2007). However, customer information does not constitute a protectible trade secret where, *inter alia*, it has not been treated as confidential and secret by the employer (*Office Mates 5*, 234 Ill. App. 3d at 574-75) or can be readily duplicated without considerable time, effort, or expense (*Stenstrom Petroleum*, 375 Ill. App. 3d at 1091).

¶ 42 As stated in the background above, the trial court's ruling in this case was that Willow failed to raise a fair question that it could satisfy the first element of the above statutory definition of a trade secret, *i.e.*, that the information within Barash's black book or the spreadsheet titled "Galina's Clients" was not sufficiently secret to derive economic value from not being generally known to others. The trial court reasoned that the information in these documents—which included client names, e-mail addresses, mailing addresses, and certain insurance policy information—was not sufficiently secret, and it was largely information that was either public or obtainable for a fee from various data brokers used within the insurance industry.

¶ 43 Willow argues on appeal that the trial court's reasoning is illogical. It asserts that the value

stemming from the secrecy of this information is shown by the fact that others would have to pay a fee to obtain it. It also disputes the correctness of the trial court's statement that the personal insurance policy information included within these documents is publicly available information. It contends that, even if some of the information within the documents is publicly available, its value nevertheless lies in the extensive effort undertaken to accumulate it in one place. The black book and spreadsheet titled "Galina's clients" comprise over 1,000 entries compiling customers' names, mailing addresses, e-mail addresses, phone numbers, policy numbers, and policy expiration dates. Willow asserts that Barash compiled this information over the course of 15 years while she was an employee of Willow and its predecessor First Midwest, which devoted substantial resources to support her while she did so. Willow contends that it would take months to recreate these customer lists by consulting public sources or by contacting customers directly after obtaining their contact information. Willow also contends that the value of the information is shown by Bondarenko's testimony that he used the "Galina's Clients" spreadsheet in his everyday work obligations for Willow and by Barash's testimony that she brought her black book to her interview at Power. Willow also asserts that the information in these documents essentially constitutes a large portion of the assets that it paid for when it purchased First Midwest. Accordingly, Willow contends that this evidence shows that a fair question exists that the information in the documents was sufficiently secret to derive economic value.

¶ 44        Willow also takes issue with the trial court's statement that the insurance policy information, even if nonpublic, would be accessible from the customers themselves. Willow contends that it is circular reasoning to disqualify customer lists from trade secret protection on the basis that the information on such lists could be obtained by contacting customers and asking them; such reasoning, it contends, could arguably apply in every case involving customer information and

would thus render meaningless the protection afforded to customer lists by the Trade Secret Act. Willow faults the trial court for relying on a Fifth District case for the proposition that insurance customers readily give their information to competing insurance companies. See *Rapp*, 231 Ill. App. 3d at 1042-43. Willow contends that this is contrary to First District precedent as set forth in *Burt Dickens & Co. v. Bodi*, 144 Ill. App. 3d 875 (1986), a case that Willow argues is "on all fours here" and mandates reversal of the trial court's denial of the preliminary injunction.

¶ 45    Having fully considered all of Willow's arguments on appeal, we nevertheless hold that the trial court did not abuse its discretion by determining that Willow had failed to raise a fair question that the customer information within Barash's black book and the spreadsheet titled "Galina's Clients" was sufficiently secret to derive economic value from being so. The evidence presented at the evidentiary hearing showed that the vast majority of the information within these documents was created prior to Willow's purchase of First Midwest on April 1, 2023. The information was the product of Barash keeping a handwritten list of the names and phone numbers of those clients with whom she had developed relationships over a 28-year period through her involvement with churches, real estate agents, and bankers who served Ukrainian, Russian, and Polish-speaking communities in the Chicago area. Only 156 of the over 1,000 entries were added to the black book during the 16 months that Willow was Barash's employer.

¶ 46    In our view, the most significant factor is the lack of evidence prior to April 1, 2023, that this was information that First Midwest ever treated as secret or confidential. To the contrary, the evidence showed that First Midwest's former owner, Robert Smith, freely shared lists including customers' names, mailing addresses, e-mail addresses, phone numbers, and insurance policy information with Barash for the purpose of enabling her to determine her annual salary. There was no evidence presented that Smith placed any restriction on Barash's ability to keep these lists or

on how she could use the information on them. This tends to suggest that she was free to keep these lists and use them even if she left employment with First Midwest and went to work for a competitor agency. Eight of these lists, dating from 2017 to 2021, were admitted into evidence at the evidentiary hearing. A cursory cross-reference of the information that is contained within these eight lists—which Willow is not claiming are its trade secrets—show that they contain much of the same customer information that is included in Barash's black book and the "Galina's Clients" spreadsheet. This is especially true with respect to customers' names, which are contained on every one of the eight lists admitted into evidence. In light of the repeated instances in which First Midwest freely shared these lists of customer names with her without any restriction, it was not an abuse of discretion for the trial court to conclude that trade secret protection does nor inure to Willow merely because Barash might have needed to consult public sources or a paid data broker to obtain contact information for some of these individuals. Similarly, it was not unreasonable for the trial court to conclude that these customers' insurance information was not secret because it was information that they would be likely to readily share with Barash if they believed she could obtain a better rate for them when it came time to renew. Its citation to a Fifth District case for this proposition is of no significance.

¶ 47         Moreover, even after Willow purchased First Midwest on April 1, 2023, no evidence was presented that Willow made any effort to ascertain what kinds of client records or information Barash already had in her possession as of that time or to ask for them back. Instead, Barens' testimony suggests that she merely assumed that nothing existed in Barash's possession outside the EZLynx program. Absent greater evidence on this point, the court will not presume that Barash was prohibited after this date from continuing to keep the records of the names and contact information of the clients whose insurance needs she had long been servicing, particularly since

Willow allowed her to continue to work from home multiple days a week in a job that involved calling clients on the phone.

¶ 48    We also reject Willow's contention that our decision in *Burt Dickens* is on "all fours" with this case. Instead, we find that case illustrates a stark contrast to this one in terms of the employer's efforts to keep the information at issue secret and confidential. There, the defendant was a 7-year employee of the plaintiff insurance agency who had complied a list of the plaintiff's customers and the expiration dates of their aviation insurance policies before leaving to form a competing insurance agency. *Burt Dickens*, 144 Ill. App. 3d at 877-78. This court affirmed the trial court's finding that the policy expiration dates were the plaintiff's trade secrets and its issuance of an injunction prohibiting the defendant from soliciting the plaintiff's accounts for one year. *Id.* at 877.

¶ 49    In setting forth the extent of the employer's efforts to keep information about customers' policy expiration dates secret and confidential, this court detailed the following:

> "[T]he customer expiration lists were available only to employees whose job required them to work with said lists. As one of four subsidiary corporations, plaintiff received periodically from its parent company its own customer expiration list. Only information pertaining to those accounts handled exclusively by plaintiff agency was included in the list. With the exception of the operations manager and the supervisor of personnel service, all employees in the agency were severely restricted from having access to the list. The operations manager was given instructions to distribute, to the salesmen working under his supervision, only that portion of the list containing the expiration dates of policies which that salesman was responsible to renew. The supervisor of personnel service was required to divide the list alphabetically prior to distributing the corresponding portions to clerical employees in charge of inputting data regarding renewals into the computer. Moreover, none

of the employees of any of the other subsidiaries had access to plaintiff's expiration lists.

Numerous precautions were additionally taken by plaintiff to guard the confidentiality of its customer lists. The information contained in the lists was stored in a computer and could only be obtained by use of a secret code. The code was known to no one except the main computer operator. As an extra safeguard, the lists were printed only one month at a time, approximately three months in advance. Every employee was told when hired that the expiration lists were the confidential property of plaintiff's and that the information contained therein could not be disclosed to any person or be removed from the office. After discovering that defendant had copied some of the confidential information for his own use plaintiff took further steps to guard the secrecy of its lists by stamping them with a legend reciting their confidentiality. Finally, plaintiff instructed its own cleaning crew to remove all computer generated records from the office's wastebaskets and transfer them to the computer department where they could be shredded and disposed of accordingly." *Id.* at 880-81.

¶ 50    The extent of efforts by the plaintiff in *Burt Dickens* to keep its customers' policy expiration dates confidential and secret is far different than this case, where lists of customers' names, contact information, and insurance policy information was freely shared with Barash every year by First Midwest with no restriction on her ability to retain or use such lists. Although Willow apparently made some efforts after April 1, 2023, to put in place rules about the confidentiality of customer information, it nevertheless made no effort to determine what customer information was already in Barash's possession and ensure that it was returned to Willow. Thus, unlike in *Burt Dickens*, the evidence here simply does not support the contention that the information claimed to be Willow's trade secret was kept sufficiently secret to drive economic value from being so. We find no abuse of discretion in the trial court's determination in this regard or its denial of the preliminary

injunction sought by Willow.

¶ 51                                    CONCLUSION

¶ 52        For the reasons set forth above, the order of the trial court denying the preliminary injunction

sought by Willow is affirmed.

¶ 53        Affirmed.